UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JAMES M. LAVINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 23-10987-BEM |
| | ) | |
| MASS GENERAL BRIGHAM INCORPORATED, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER ON DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

**MURPHY, J.**

This case arises out of the denial of a nurse's request for a religious exemption from a mandatory COVID-19 vaccination policy. Mass General Brigham Incorporated and North Shore Medical Center, Inc. (collectively, "Defendants") have moved for summary judgment on the grounds that Plaintiff cannot establish any of the three elements of a *prima facie* case of religious discrimination, and allowing Plaintiff to remain in his position unvaccinated would have imposed an undue hardship on Defendants' operations. For the reasons set forth below, the motion for summary judgment will be granted, and this action will be dismissed.

I.      **Background**

    A.      **Factual Background**

Except where otherwise noted, the following facts are undisputed.[1]

        1.      **The Parties**

Mass General Brigham Incorporated ("MGB") is the largest academic health system and largest private employer in Massachusetts. Dkt. 38 ("Defs.' SOF") ¶ 4. As of November 2021, MGB was comprised of at least 16 member institutions and encompassed 6,500 physicians, 9,100 nurses, and another 78,000 individuals who collectively provided care for 1.5 million patients annually in hospitals, labs, physicians' offices, outpatient centers, rehabilitation facilities, urgent-care clinics, and patients' homes. *Id.* ¶¶ 1–3. One of MGB's entities is Salem Hospital, previously known as North Shore Medical Center, Inc. (the "Hospital"). *Id.* ¶ 1.

James Lavine was employed as a Registered Nurse ("RN") at the Hospital from 2005 until the termination of his employment in November 2021. *Id.* ¶ 79. In 2020 and 2021, Plaintiff's job functions required him to work in the Hospital, interacting in person with patients, patients' family members, members of the public, and colleagues. *Id.* ¶ 99. Plaintiff's patients included, among others, cardiac patients, elderly patients, cancer patients, individuals recovering from surgery, and patients with autoimmune disorders. *Id.* ¶¶ 82–84, 89–92. Plaintiff directly interacted with patients during every shift, and his duties included taking patients' vitals, administering medications, helping to position patients, examining patients, and drawing blood. *Id.* ¶ 94.

---

[1] Plaintiff did not dispute 93 of the 99 paragraphs of Defendants' Statement of Undisputed Facts. *See* Dkt. 38; Dkt. 41 (listing only six paragraphs—paragraphs 14–15, 17, and 33–35—in his "Statement in Opposition to Defendants' Statement of Material Facts" and providing a 27-paragraph "Statement of Additional Material Facts in Dispute"). Accordingly, those 93 paragraphs are deemed admitted. *See* Local Rule 56.1; *see also Stonkus v. City of Brockton Sch. Dep't*, 322 F.3d 97, 102 (1st Cir. 2003) ("Because [the plaintiff] did not controvert the statement of undisputed material facts that the defendants filed with their summary judgment motion, we deem those facts admitted.").

Plaintiff also worked in close contact with staff members at the Hospital. *Id.* ¶ 96. When working on-site at the Hospital, it was not always possible for Plaintiff to remain six feet or more away from every colleague, patient, visitor, or member of the public. *Id.* ¶ 98.

### 2. COVID-19

COVID-19 is a highly contagious viral disease that can cause serious illness and death. *Id.* ¶ 6. More than 1,000,000 Americans—including 25,000 Massachusetts residents alone—have died from COVID-19. *Id.* ¶ 7.

MGB has cared for thousands of COVID-19 patients since the pandemic's onset. *Id.* ¶ 8. During the pandemic, MGB treated medically vulnerable people who faced a higher risk than the general public of suffering serious disease and death from COVID-19, including, for example, elderly patients, cancer patients and others with weakened immune systems, patients with severe heart and lung disease, infants in the neonatal intensive care unit, pregnant patients, and pediatric patients not yet eligible for vaccination. *Id.* ¶ 9.

### 3. The COVID-19 Vaccination Policy

Before issuing its COVID-19 Vaccination Policy (the "Vaccination Policy"), MGB recognized the immense burden that COVID-19 had placed on MGB as a healthcare system, particularly with respect to its patients and employees. *Id.* ¶ 10. MGB's patients were uniquely vulnerable to COVID-19, a disease that—for those patients—was especially deadly. *Id.* ¶ 11. Even with all of MGB's other controls, such as the implementation of masking requirements and other infection-control measures to reduce the risk of the spread of infection, COVID-19 continued to spread in hospitals, and there was a need for more measures to protect both patients and staff. *Id.* Dr. Michael Klompas, Hospital Epidemiologist at Brigham and Women's Hospital, and his

colleagues in MGB's senior leadership recommended that MGB leaders enact a staff vaccination requirement as a necessary additional measure. *Id.*[2]

By June 2021, more than 600,000 people in the United States had died from COVID-19, and MGB, like other healthcare systems around the world, was confronting the unprecedented public health emergency. *Id.* ¶ 12. MGB's decision to implement a requirement that its staff become vaccinated against COVID-19 was informed by the circumstances that existed in mid-2021, and some of MGB's most senior leaders—including world-renowned experts in infectious disease and infection control—were involved in making that important decision. *Id.* ¶¶ 12–13. MGB's decision to implement the Vaccination Policy and the way it structured the Vaccination Policy were informed by its own experience as a healthcare system and by the latest public health guidance from federal and state public health authorities, including the Centers for Disease Control and Prevention ("CDC"). *Id.* ¶ 16. Indeed, at the time that MGB was considering whether to require its staff to be vaccinated against COVID-19 as a condition of employment, it understood and relied upon the CDC's recommendation that vaccination was the best way to reduce the transmission of COVID-19. *Id.* ¶ 17.[3] MGB also found support in the prioritization set by the federal and state governments that included all hospital workers in the first wave of

---

[2] To the extent Plaintiff states that "[f]rom the outset of the COVID outbreak, Defendants told Plaintiff and its other employees that they would all be safe with masking, gloves, other PPE, testing and social distancing," Dkt. 41 ¶ 9, such an assertion—even if accepted as true—does not undermine the undisputed fact that, once vaccines had become available, MGB determined that "there was a necessity for more measures to protect patients and staff," and that a staff vaccination requirement was recommended "as a necessary *additional* measure," Defs.' SOF ¶ 11 (emphasis added).

[3] Plaintiff has purported to dispute paragraph 17, contending both that "Defendants repeatedly told Plaintiff that Masking, PPE, testing and social distancing would keep him and Defendants' employees safe" and that "Defendants' policy is not logical as Patient's [sic], vendors and visitors to the hospital were not required to be vaccinated as a condition of admission to the hospital premises." Dkt. 41 at 2. Even if accepted as true, neither of those assertions creates a factual dispute as to the statements contained within paragraph 17—that is, that MGB understood and relied on the recommendation of the CDC in determining whether to require its staff to be vaccinated against COVID-19.

4

vaccinations, which was consistent with the need to preserve the integrity of the healthcare workforce during the pandemic. *Id.* ¶ 20.

MGB also relied on clinical data and trends that showed that COVID-19 vaccines had high efficacy to prevent symptomatic COVID-19 and even higher efficacy to prevent hospitalizations and deaths; that COVID-19 vaccines had similar or better safety profiles than other vaccines that had obtained full FDA approval; and that vaccination offered advantages regarding patient and healthcare personnel safety. *Id.* ¶ 18.  The available clinical data, and MGB's own experience, further showed that (i) morbidity and mortality of COVID-19 far exceeded that of influenza; (ii) COVID-19 had been uniquely disruptive to hospital operations and workforce continuity, far more so than influenza and other infectious diseases; (iii) healthcare workers and other essential workers had higher rates of infection than people in other fields; (iv) masking, though it reduced the risk of nosocomial transmission, was imperfect; and (v) the available COVID-19 vaccines afforded a level of additional and constant protection without requiring reminders, persuasion, mask-fitting aids, or other behavioral changes. *Id.* ¶ 19.

Yet another important consideration for MGB's decision to implement the Vaccination Policy was promoting public and patient trust in the safety of MGB facilities, as many patients delayed coming to hospitals or doctors' offices for fear of contracting COVID-19, causing those patients to require more acute care when they did reach their provider. *Id.* ¶¶ 21–22.  That connection between patients' perception of safety, on the one hand, and deferral of care, on the other, was a crucial reason why MGB felt it necessary to assure both safety and the perception of safety. *Id.* ¶ 22.  MGB also determined that the Vaccination Policy would help ensure that it was a safe place for visitors to the system's medical facilities, as many medically vulnerable people visit MGB hospitals and offices every day to provide needed support to family members. *Id.* ¶ 23.

### 4.    Plaintiff's Exemption Request

The Vaccination Policy allowed employees to request exemptions for religious or medical reasons. *Id.* ¶ 24. Religious exemption requests under the Vaccination Policy were reviewed by a Religious Exemption Review Committee (the "RERC"). *Id.* ¶ 27. The RERC was advised, before reviewing any exemption requests, of MGB's urgent health and safety priorities that would impact the review process. *Id.* ¶ 29. The RERC members were further advised that the pandemic—especially the rapid spread of the Delta variant of COVID-19—was a public health emergency; that MGB therefore had an urgent responsibility to continue serving its patient population, as well as to protect its staff, medically vulnerable patient population, and visitors from infection; and that the perception of safety was critical for patients, visitors, and the public. *Id.* ¶ 30. The committee members were advised that a rigorous process was necessary to minimize the risk that unvaccinated staff remained as sources of potential infection while interacting with other staff, patients, and visitors, which would pose an undue hardship on MGB's operations. *Id.* The RERC was also aware that the upcoming fall and winter seasons were particularly concerning for new surges of COVID-19 infection given the highly transmissible Delta variant. *Id.* ¶ 31. The RERC factored into its decision-making the public health considerations that flowed from allowing exemptions from the Vaccination Policy, such as the risks that unvaccinated staff posed to MGB's patients, employees, and visitors. *Id.* ¶ 36.

Plaintiff asserts that he had a history of seeking exemptions from taking vaccines and that in the past, "Defendant had approved Plaintiff's religious exemption from taking a flu vaccine." Dkt. 41 ¶¶ 12–13. Plaintiff does not, however, dispute that the process for his flu vaccine exemption request differed from the Vaccination Policy that would be implemented for COVID-19 due to the volume of exemption requests from the Vaccination Policy that MGB received and

because the severity of the threat posed by the COVID-19 pandemic far exceeded that posed by the flu in prior years. Defs.' SOF ¶ 37.

Plaintiff has also contended that "he could not take the COVID Vaccine and allow it to destroy Gods work"; that "being vaccinated would disrupt and undermine [his] relationship with God"; and that he has held his beliefs about vaccinations since 1995. Dkt. 41 ¶ 14; Defs.' SOF ¶¶ 52–53. Plaintiff has been vaccinated on 15 occasions between 1997 and 2019. Defs.' SOF ¶ 54. For example, Plaintiff received the MMR vaccine in 2002 and 2003, and he believes that he may have received that vaccine—even though doing so violated his religious beliefs—because it was required for nursing school. *Id.* ¶ 58. More recently, in August 2021, Plaintiff began taking insulin by injection—also in asserted violation of his religious beliefs—in order to obtain an increase in his life insurance. *Id.* ¶ 66. When Plaintiff was asked why he could violate his religious beliefs to obtain an increase in life insurance but could not do so when his employer required COVID-19 vaccination, Plaintiff testified that his faith "waxes and wanes." *Id.* ¶ 67.

On September 1, 2021, Plaintiff submitted a request for a religious exemption from the Vaccination Policy. *Id.* ¶ 39. Following a request from the RERC for further explanation, *id.* ¶ 41, and after Plaintiff submitted additional information in support of his request, *id.* ¶¶ 42–48, 50, Plaintiff's religious exemption request was denied, *id.* ¶ 51.

B.     **Procedural Background**

Plaintiff initiated this action in November 2022 in Massachusetts state court. As amended, the complaint asserted claims under Mass. Gen. Laws ch. 151B; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Due Process and Equal Protection clauses of the Constitution; and the Massachusetts Declaration of Rights.

Defendants moved to dismiss the complaint on May 18, 2023. On November 28, 2023, the motion was granted as to the claims under the Constitution and Massachusetts Declaration of

Rights and the retaliation claims under Title VII and Chapter 151B, and denied as to the failure to accommodate claims under Title VII and Chapter 151B.

Defendants have now moved for summary judgment on the remaining counts of the complaint, contending both that Plaintiff has not established a *prima facie* case of religious discrimination and that granting the requested accommodation would have imposed undue hardship as a matter of law. The Court took the motion under advisement following a hearing on May 9, 2025.

**II.**    **Standard of Review**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant" but "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023) (quoting *Lahens v. AT&T Mobility P.R., Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)). The nonmoving party cannot "rest upon mere allegation or denials," but must instead "present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986).

### III. <u>Analysis</u>

#### A. <u>Religious Discrimination</u>

"Title VII declares it an 'unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion.'" *Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 89 (1st Cir. 2025) (quoting 42 U.S.C. § 2000e-2(a)). "[T]he First Circuit applies a two-part framework to religious discrimination claims under Title VII." *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir. 2004).[4]

> First, a plaintiff must make his prima facie case that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action. The burden then shifts to the employer to show that it offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship.

*Melino v. Bos. Med. Ctr.*, 2024 WL 2724145, at *1 (D. Mass. May 28, 2024) (quoting *Lowe v. Mills*, 68 F.4th 706, 719 (1st Cir. 2023)), *aff'd*, 127 F.4th 391 (1st Cir. 2025). As noted, Defendants have moved for summary judgment on two independent grounds, arguing that Plaintiff cannot show a sincere religious conflict with the Vaccination Policy, and that granting Plaintiff's requested exemption from the Vaccination Policy would have resulted in undue hardship.

"Here, the Court need not determine whether [P]laintiff has established a *prima facie* case because, even assuming he has, his claim fails at the undue-hardship stage." *See Andrade v. Massachusetts Dep't of Correction*, 2025 WL 319563, at *4 (D. Mass. Jan. 13, 2025); *see also Melino*, 2024 WL 2724145, at *1 (declining to "decide whether [the plaintiff] has made her prima

---

[4] "Religious discrimination claims under Title VII and Chapter 151B are generally analyzed under the same framework. Because [Plaintiff] points to no difference between the statutes that affects the analysis in this case, the Court analyzes both claims under the Title VII framework." *Cyr v. Bos. Med. Ctr.*, 2025 WL 269239, at *4 n.3 (D. Mass. Jan. 22, 2025) (citation omitted); *see also Rodrique*, 126 F.4th at 90 n.1 ("treat[ing] the claims as rising and falling together" where "neither party ha[d] identified relevant differences between religious discrimination claims under Title VII and Chapter 151B, nor provided any analysis specific to Chapter 151B").

9

facie case because, even assuming she has, her claim fails at the undue hardship stage"); *Harmon v. Bos. Med. Ctr.*, 2024 WL 4815292, at *4 (D. Mass. Nov. 18, 2024) (same); *Buchanan v. Massachusetts Dep't of Correction*, 2024 WL 5202787, at *4 (D. Mass. Dec. 23, 2024) (same); *Cyr v. Bos. Med. Ctr.*, 2025 WL 269239, at *4 (D. Mass. Jan. 22, 2025) (same); *Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 90 (1st Cir. 2025) (reviewing grant of summary judgment where district court had determined that plaintiff had failed to establish that his opposition to COVID-19 vaccine was in fact religious, and affirming on alternative undue-hardship ground).

B. <u>Undue Hardship</u>

"The undue hardship defense is built into the statutory definition of 'religion,' such that an employment action cannot constitute discrimination on the basis of religion, and an employer cannot be liable under Title VII for religious discrimination, if the undue hardship defense applies." *Cyr*, 2025 WL 269239, at *5 (quoting *Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9, 17–18 (1st Cir. 2024)). "[A] successful undue hardship defense requires the employer to show that 'the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business.'" *Bazinet*, 113 F.4th at 18 (quoting *Groff v. DeJoy*, 600 U.S. 447, 470 (2023)). "This requires courts to take 'into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer.'" *Id.* (quoting *Groff*, 600 U.S. at 470–71). "Both economic and non-economic costs are relevant to the substantial hardship analysis." *Cyr*, 2025 WL 269239, at *5. "Relevant non-economic costs include health and safety risks, as well as the risk of reputational injury." *Id.* (citing *Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 435 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022)). "Moreover, in determining undue hardship, it is appropriate to consider aggregate effects when multiple

employees are granted the same accommodation." *Andrade*, 2025 WL 319563, at *4 (quoting *Together Emps.*, 573 F. Supp. 3d at 437).

Defendants contend that "the sole accommodation Plaintiff sought—to remain in his position as an inpatient hospital nurse while unvaccinated against COVID—would have required Defendants to place Plaintiff's patients, not to mention other patients, fellow hospital staff, visitors, and members of the public, at an unacceptable increased risk of danger from infection with a potentially fatal disease," thereby compelling a finding of undue hardship as a matter of law. Dkt. 37 at 20. Based on the undisputed evidence, this Court agrees. The reasoning in *Harmon v. Boston Medical Center*, a recent case in this District in which the court granted summary judgment to an employer on undue-hardship grounds, is instructive:

> BMC has established that granting Ms. Harmon's accommodation would have resulted in an undue hardship for the hospital. Ms. Harmon's work as an RN placed her in a particularly risky position to spread infection, as she was in-person and in close contact with vulnerable patients, their families, and other BMC staff. Allowing her to remain unvaccinated would have increased the risk of spreading COVID-19 throughout the hospital and beyond. *See Antredu v. Massachusetts Dep't of Youth Servs.*, No. 22-cv-12016, 2024 WL 1539725 at *5 (D. Mass. Apr. 9, 2024) (concluding that accommodating plaintiff's request to remain unvaccinated constituted an undue hardship due to plaintiff's close proximity to patients and that staff placed clients and colleagues at a higher risk of COVID-19). Furthermore, increased risk of transmission of COVID-19 within the hospital would "negatively impact its reputation of providing safe care for patients and would increase the possibility of legal liability." Therefore, if BMC allowed the accommodation, such accommodation would impede the BMC's ability to provide a safe environment for their already vulnerable patients, and negatively impact its reputation. Thus, BMC has established that granting Ms. Harmon's accommodation would have resulted in an undue hardship for the hospital.

2024 WL 4815292, at *5 (citation omitted). Here, too, Plaintiff's work as an RN placed him in a particularly risky position to spread infection. It is undisputed that Plaintiff worked at the Hospital in person, interacting directly with vulnerable patients, patients' family members, members of the public, and colleagues; and that it was not always possible for him to socially distance. *See, e.g.*, Defs.' SOF ¶¶ 94, 96–99. It is also undisputed that (i) COVID-19 had placed an immense burden

11

on MGB as a healthcare system, *id.* ¶ 10; (ii) even with all of MGB's other controls, such as masking requirements and other infection control measures, there was still spread of COVID-19 in hospitals, and there was a necessity for more measures to protect patients and staff, *id.* ¶ 11; (iii) COVID-19 had been uniquely disruptive to hospital operations and workforce continuity, and the available COVID-19 vaccines afforded a level of additional and constant protection, *id.* ¶ 19; (iv) MGB's decision to implement the Vaccination Policy was informed by its own experience as a healthcare system and the latest public health guidance from federal and state public health authorities, including the CDC, *id.* ¶ 16; and (v) an important consideration for MGB's decision to implement the Vaccination Policy was public and patient trust in the safety of MGB facilities, *id.* ¶ 21. Accordingly, granting the requested accommodation would have resulted in undue hardship. *See Harmon*, 2024 WL 4815292, at *5 (concluding that the hospital had established undue hardship where allowing the accommodation would have "impede[d] the [hospital]'s ability to provide a safe environment for their already vulnerable patients, and negatively impact its reputation").

As with the plaintiff in *Andrade*, another religious-discrimination case recently decided in this District, "Plaintiff has offered little to challenge the notion that infections in his workplace would cause legitimate hardship on defendant's operations," and instead "contests the efficacy of the COVID-19 vaccine in reducing risk of infection." 2025 WL 319563, at *5. Plaintiff argues, for example, that whether "the vaccine was effective in preventing contracting or spreading the disease" is a "material fact [that] is disputed by many leading authorities including the Plaintiff and is a crucial fact at the center of this case." Dkt. 40 at 3. "The flaw in this argument is that such evidence is not in dispute." *See Cyr*, 2025 WL 269239, at *6 (observing that although "the vaccines' efficacy, including the magnitude and duration of their protective effects, may still be

12

the subject of debate and study within the scientific community," "ongoing scientific debate regarding the extent of the vaccines' protective effects does not raise a genuine dispute as to whether the vaccines mitigate the risk of an individual contracting and transmitting COVID-19"). Indeed, "[t]he First Circuit explained over three years ago that 'COVID-19 vaccines protect against infection,' lower the risk of adverse consequences in the case of infection, and 'reduc[e] a person's risk of transmitting COVID-19 to others.'" *Id.* (quoting *Does 1-6 v. Mills*, 16 F.4th 20, 32–33 (1st Cir. 2021)). "And it has made clear that when 'the record demonstrates that [an employer] relied on the objective, scientific information available to [it], with particular attention to the views of public health authorities,' a court will find that the employer 'acted reasonably when it determined that vaccinated employees are less likely to transmit COVID-19 than unvaccinated employees.'" *Id.* (alterations in original) (quoting *Rodrique*, 126 F.4th at 91).[5] As previously set forth, the undisputed record establishes that Defendants relied on "the objective, scientific information" available to them when determining that vaccinated employees were less likely to transmit COVID-19 than unvaccinated employees.

In sum, the undisputed facts show that granting Plaintiff an exemption to the Vaccination Policy would have caused an undue burden on Defendants. Accordingly, the motion for summary judgment will be granted.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 36) is GRANTED.

---

[5] To the extent Plaintiff has argued that "Defendants' policy is not logical as Patient's [sic], vendors and visitors to the hospital were not required to be vaccinated as a condition of admission to the hospital premises," Dkt. 41 at 2, that assertion—even if true—does not create a factual dispute. *Cf. Together Emps.*, 573 F. Supp. 3d at 436 (observing that "MGB cannot simply turn away unvaccinated patients," and that, "in any event, the issue is whether granting *employees* an accommodation from the COVID-19 vaccine would impose an undue hardship; the vaccination status of defendant's patients or visitors is not material" (emphasis in original)).

**So Ordered.**

                                                          /s/ Brian E. Murphy  
                                                          Brian E. Murphy  
Dated: May 12, 2025                          Judge, United States District Court